United States District Court
for the
Southern District of Florida

David Diaz, Plaintiff,

v.

Liberty Life Assurance Company of Boston, Defendant.

Civil Action No. 17-20662-Civ-Scola

**Order on Cross-Motions for Summary Judgment**

This matter is before the Court on the parties' cross-motions for summary judgment (ECF Nos. 25, 27). For the reasons explained in this Order, the Plaintiff's Dispositive Motion for Summary Judgment (ECF No. 25) is **denied**, and the Defendant's Motion for Summary Judgment (ECF No. 27) is **granted**.

1. **Background**

This is an ERISA benefits denial case. Plaintiff David Diaz worked as a District Manager for JM Family Enterprises, Inc. ("JM Family Enterprises") from September 13, 2010 through October 15, 2015. (Pl's Statement of Facts ¶¶ 7, 11, ECF No. 26; Def.'s Statement of Facts ¶ 3, ECF No. 28.) JM Family Enterprises sponsors an employee benefit plan that provides employees who become disabled due to injury or sickness with long term disability ("LTD") benefits. (Def.'s Statement of Facts ¶ 1; Admin. R. at 25, ECF No. 24-1.) Defendant Liberty Life Assurance Company of Boston ("Liberty") insures the LTD benefits. (Def.'s Statement of Facts ¶ 2.) The LTD policy defines "disabled" as follows:

  i. that during the Elimination period and the next 24 months of Disability the Covered person, as a result of Injury or Sickness, is unable to perform the Material and Substantial Duties of his Own occupation; and

  ii. thereafter, the Covered Person is unable to perform, with reasonable continuity, the Material and Substantial Duties of Any Occupation.

(Admin. R. at 11, ECF No. 24-1.) The term "Material and Substantial Duties" is defined as "responsibilities that are normally required to perform the Covered Person's Own Occupation, or any other occupation, and cannot be reasonably eliminated or modified." (*Id.* at 14.) The "Elimination Period" is defined as "a period of consecutive days of Disability or Partial Disability for which no benefit

is payable." (*Id.* at 12.) The Elimination Period lasts for 180 days from the first day of disability. (*Id.* at 6, 12.)

On October 28, 2014, Diaz was involved in a work-related motor vehicle accident that resulted in chronic neck and low back pain. (Pl.'s Statement of Facts ¶¶ 1-2; Def.'s Statement of Facts ¶ 4.) Diaz submitted a workers' compensation claim and his treating physicians initially recommended work restrictions. (Pl.'s Statement of Facts ¶ 4, Def.'s Statement of Facts ¶ 5.) The restrictions were lifted and Diaz was returned to full-duty status on November 3, 2014. (Def.'s Statement of Facts ¶ 5.) Diaz saw a variety of physicians in multiple specialties over the next year, but he continued to work full-time. (Pl.'s Statement of Facts ¶¶ 14-18; Def.'s Statement of Facts ¶¶ 6-15.) On September 1, 2015, the Plaintiff relocated from Orlando to Tampa, obtaining a transfer within the company. (Def.'s Statement of Facts ¶ 15.) On October 16, 2015, the Plaintiff stopped working. (*Id.* ¶ 16.) On April 1, 2016, Liberty received Diaz's claim for LTD benefits due to chronic neck and low back pain, degenerative disc disease, muscular spasms, left shoulder pain, and adjustment disorder with mixed anxiety and depressed mood. (Admin. R. at 97-98, ECF No. 24-3; Def.'s Statement of Facts ¶ 19.)

During its review of Diaz's claim, Liberty obtained a job description from JM Family Enterprises, which was reviewed by a vocational expert. (Admin. R. at 258-262, ECF No. 24-3.) The vocational expert determined that Diaz's occupation was performed at either a sedentary or light level, depending on whether Diaz was traveling or at his office. (*Id.* at 260-61.) On April 28, 2016, Liberty denied Diaz's claim for LTD benefits, concluding that there was insufficient proof that Diaz had a disability as defined by the policy. (Def.'s Statement of Facts ¶ 29; Pl.'s Statement of Facts ¶¶ 25, 29.) The denial letter stated that a consulting physician and a consulting psychiatrist had reviewed Diaz's medical records. (Admin. R. at 98, ECF No. 24-3.) The denial letter summarized the consulting physician's conversation with one of Diaz's treating physicians, Dr. Abrahams. (*Id.*) Dr. Abrahams reported that Diaz's progress was difficult to track because "his treatment course was disjointed," and he did not return for treatment for approximately three months. (*Id.*) Diaz later returned for several more appointments. (*Id.*) Dr. Abrahams reported that Diaz "had difficulty tolerating treatment provided and that improvement as a result was slow." (*Id.*) Dr. Abrahams noted that Diaz drove himself to his appointments, but complained of pain. (*Id.*)

The denial letter also summarized the consulting physician's conversation with Diaz's physical therapist, John Vincent Esquetta. (*Id.*) Esquetta reported that assessment of Diaz's strength and motion "was quite difficult given inconsistency in performance and a decrease in voluntary effort

with testing." (*Id.*) Esquetta reported that Diaz was not compliant with the plan of care, and either cancelled or did not show up for ten appointments, including the final three scheduled appointments. (*Id.*) Therefore, re-evaluation at the end of the treatment plan was not possible. (*Id.*) Esquetta reported that Diaz had explained that scheduling the appointments was difficult with his work schedule. (*Id.*)

Finally, the denial letter summarized the consulting physician's conversation with another of Diaz's treating physicians, Dr. Molinares. (*Id.*) Dr. Molinares confirmed that Diaz's primary diagnoses were chronic neck and low back pain, muscular spasm, anxiety and significant depression. (*Id.*) Dr. Molinares reported that Diaz was no longer working "to allow for treatment of his impairing psychiatric diagnosis." (*Id.*) Although Dr. Molinares noted some physical limitations in her last examination of Diaz, she reported that she believed that "a significant part of the problem is his direct supervisor who the claimant reports 'has been verbally abusive' and that this in combination with his chronic pain syndrome have caused significant exacerbation of his condition." (*Id.* at 98-99.) Dr. Molinares opined that once Diaz's depression was under control, he "likely would be able to return to a job situation that was sedentary to light duty 'as long as he was transferred with a new boss.'" (*Id.* at 99.) Dr. Molinares recommended a neurosurgical referral, and reported that a previous neurologic evaluation was "reassuring and normal." (*Id.*)

The consulting physician concluded that the information in Diaz's medical records supported the diagnoses for which Diaz submitted his claim, as well as disc protrusions, hypertension, and chronic nicotine dependence. (*Id.*) However, the consulting physician concluded that "there is no medical basis upon which to conclude that Mr. Diaz's physical condition changed in such a way that it has a significant continuing adverse impact on his usual life activities . . . ." (*Id.*) In addition, the physician concluded that "there is no medical basis upon which to conclude that restrictions or limitations are medically supported. (*Id.*)

The consulting psychiatrist opined that the information in the medical records supported Diaz's diagnoses of adjustment disorder with mixed anxiety and depressed mood. (*Id.*) However, there was no evidence in the records of a psychiatric diagnosis or impairment until March 1, 2016. (*Id.*) The March 1, 2016 assessment documented that Diaz's symptoms "were directly related to work related stress." (*Id.*) In addition, the assessment noted additional psychiatric symptoms that "may be indicative of moderate difficulty in social, occupational and interpersonal functioning." (*Id.*) The consulting psychiatrist stated that the reported symptoms were likely to improve within six to eight

weeks with appropriate treatment, and thus psychiatric impairment was reasonable through the end of April 2016. (*Id.* at 100.)

As a result of these reports, Liberty concluded that there was insufficient evidence of medically supported psychiatric or physical restrictions and limitations throughout the entire Elimination Period that precluded Diaz from performing his own occupation. (*Id.*) Therefore, Diaz did not meet the policy's definition of disability. (*Id.*)

On October 25, 2016, Diaz appealed the denial. (Def.'s Statement of Facts ¶ 32; Pl.'s Statement of Undisputed Facts ¶ 41.) Liberty upheld the denial on January 24, 2017. (Def.'s Statement of Facts ¶ 36; Pl.'s Statement of Undisputed Facts ¶ 47.) The denial letter noted that Diaz would have been eligible to receive benefits benefits on April 13, 2016, after the expiration of the Elimination Period. (Admin. R. at 62, ECF No. 24-1.) In support of Diaz's appeal, he submitted a Functional Capacity Evaluation ("FCE") dated October 4, 2016. (*Id.* at 65.) He also submitted Dr. Molinares's treatment records. (*Id.*) The letter noted that Diaz was seen in the emergency room on October 16, 2015 due to chest pain, and subsequently established primary care with Dr. Molinares. (*Id.*) On October 19, 2015, Dr. Molinares reported "a slightly antalgic gait," normal motor strength in the upper and lower extremities, good judgment and insight, and a full range of mood/affect. (*Id.*) However, on April 10, 2016, Dr. Molinares's records showed that Diaz reported his back pain to be an 8 out of 10. (*Id.*)

The denial letter also summarized records that Diaz submitted from Dr. Westerfield, a family medicine and sports doctor. (*Id.*) On April 4, 2016, Diaz reported "persistent 'lumbar radiculopathy to the toes including numbness and tingling,' and reported his constant pain to be 8/10." (*Id.*) Dr. Westerfield performed an exam and found that Diaz was not in acute distress and had a normal gait without any assistive devices. (*Id.*) Dr. Westerfield reported on a workers' compensation form that Diaz was able to perform light duty work, including lifting and carrying up to 20 pounds, with "limited standing/sitting with frequent rest breaks." (*Id.*)

On May 23, 2016, Diaz saw Dr. Williams of Doctor's Pain Management Group and reported persistent pain. (*Id.*) Diaz had last seen Dr. Williams in April of 2015. (*Id.*) On July 25, 2016, Diaz reported to a Dr. Barna that his pain was an 8 out of 10, but Dr. Barna reported that Diaz was in no apparent distress. (*Id.*) Dr. Barna reported on a workers' compensation form that Diaz was able to perform light duty work. (*Id.*) Diaz also submitted a letter from two physical therapists, who reported that Diaz was evaluated on September 29, 2016, and that neither therapist recommended that Diaz continue therapy because he was "unable to tolerate any treatment." (*Id.* at 65-66.)

On October 4, 2016, Diaz completed the FCE, which showed that he was performing below a sedentary physical demand level. (*Id.* at 66.) Dr. Molinares agreed with the findings of the FCE. (*Id.*) Diaz saw Dr. Molinares for a follow-up appointment on October 26, 2016, and reported that pain medication was helping. (*Id.* at 65.)

Liberty had all of the medical documentation on file reviewed by an independent psychiatrist and an independent physician. (*Id.* at 66.) The denial letter noted that no psychiatry or mental health records were submitted on appeal. (*Id.* at 65.) The independent psychiatrist, Dr. Forehand, concluded that Diaz's diagnosis of adjustment disorder with mixed anxiety and depressed mood was supported by the medical records. (*Id.* at 66.) However, Dr. Forehand concluded that the reported deficits in concentration were only supported from March 1, 2016 through April 21, 2016, and did not rise to the level of impairment. (*Id.*) He specifically noted that, although the records show that "deficits were briefly present," there was only one statement in the record that indicated any impairment, which was a March 1, 2016 note from Dr. Rodriguez stating "impaired for work/school." (*Id.*) Dr. Forehand explained that Diaz's infrequent mental health visits and "absent medication changes" indicated a lack of limitations. (*Id.*) He concluded that there was no evidence to support psychiatric limitations from October 16, 2015 through the date of the appeal. (*Id.*)

With respect to Diaz's physical ailments, the documentation was reviewed on appeal by Dr. Jamie Foland. (*Id.*) Dr. Foland concluded that the documentation did not support any medical diagnoses causing functional impairment from October 16, 2015 through April 12, 2016. (*Id.*) From April 13, 2016 forward, Dr. Foland concluded that the scope and severity of Diaz's pain was not consistent with the severity and scope of his medical conditions and the intensity of his treatment. (*Id.*) The CT scans of Diaz's spine that were performed at the time of his accident did not show any significant abnormalities. (*Id.*) The EMG/nerve conduction studies conducted after the accident were normal, as was an MRI of Diaz's brain that was performed on November 6, 2015. (*Id.*) Dr. Newman, a neurologist, evaluated Diaz in October and November of 2015 and did not find any neurological deficits, and the records indicated that Diaz was able to return to work without any restrictions or limitations following the accident. (*Id.* at 66-67.) Dr. Foland found that this fact, combined with Diaz's non-compliance with physical therapy, indicated that Diaz's functional capability was greater than what he alleged. (*Id.*) Dr. Foland further noted that Diaz was on limited pain medications at the time of the injury, but was not on any medication when he was seen by Dr. Williams on February 27, 2015 and May 23, 2016. (*Id.*)

Dr. Foland opined that the results of the FCE were not consistent with the normal neurological examinations performed by Dr. Westerfield and Dr. Newman, as well as other records in the file. (*Id.*) Dr. Foland noted that a physical therapist indicated on October 12, 2015 that Diaz "had self-limiting behavior and inconsistencies with therapy," which Dr. Foland found to be consistent with the fact that Diaz's FCE results on some of the grip and pinch strength tests were not valid, consistent, or reproducible. (*Id.*) In addition, Dr. Foland opined that the "accuracy and reliability of functional capacity evaluations have not been adequately researched." (*Id.*)

The denial letter noted that Diaz asserted in his appeal that Liberty had ignored Diaz's limitations of "pain, fatigue, and weakness." (*Id.*) The denial letter stated that Dr. Molinares's notes did not indicate that Diaz had reported fatigue. (*Id.*) With respect to weakness, Dr. Newman, Dr. Barna, and Dr. Molinares all reported that Diaz had normal strength. (*Id.*) With respect to pain, Dr. Foland opined that Diaz's complaints of pain were not consistent with the findings of the diagnostic imaging studies. (*Id.*)

Liberty concluded that:

> [W]e acknowledge that Mr. Diaz may have continued to experience some neck and back pain, and anxiety and depression, associated with his condition, beyond April 12, 2016. However, the information does not contain physical, cognitive, or psychiatric exam findings, diagnostic test results, functional capacities evaluation, hospitalization records, or other forms of medical documentation supporting Mr. Dolan's [sic] symptoms remained of such severity, frequency and duration that they resulted in restrictions or limitations rendering Mr. Dolan [sic] unable to perform the duties of his own Sales Manager occupation at either the sedentary of [sic] light physical demand level, after October 16, 2015.

(*Id.* at 68.)

Diaz filed this lawsuit on February 21, 2017, asserting that he is entitled to LTD benefits and alleging that Liberty "failed to consider objective physical conditions and non-exertional limitations such as the effects of pain, impaired attention and concentration, and side effects of heavy narcotics." (Compl. ¶¶ 39, 45.)

## 2. Legal Standard

Although this matter is before the Court on cross-motions for summary judgment, in an ERISA benefits denial case "the district court sits more as an

appellate tribunal than as a trial court." *See Curran v. Kemper Nat. Servs., Inc.*, No. 04-14097, 2005 WL 894840, at *7 (11th Cir. Mar. 16, 2005) (quoting *Leahy v. Raytheon Co.*, 315 F.3d 11, 17-18 (1st Cir. 2002)). The court "does not take evidence, but, rather, evaluates the reasonableness of an administrative determination in light of the record compiled before the plan fiduciary." *Id.* Thus, there "may indeed be unresolved factual issues evident in the administrative record, but unless the administrator's decision was wrong, or arbitrary and capricious, these issues will not preclude summary judgment as they normally would." *Pinto v. Aetna Life Ins. Co.*, No. 09-01893, 2011 WL 536443, at *8 (M.D. Fla. Feb. 15, 2011); *Turner v. Am. Airlines, Inc.*, No. 10-80623, 2011 WL 1542078, at *4 (S.D. Fla. Apr. 21, 2011) (Hurley, J.) ("[W]here, as here, the decision to grant or deny benefits is reviewed for abuse of discretion, a motion for summary judgment is merely the conduit to bring the legal question before the district court and the usual tests of summary judgment, such as whether a genuine dispute of material fact exists, do not apply.") (internal quotations omitted).

Under 29 U.S.C. § 1132(a)(1)(B), a benefit plan participant or beneficiary may bring a civil action to recover benefits due to her under the terms of the plan, and to enforce or clarify her rights under the terms of the plan. The provision does not set forth the appropriate standard of review for actions challenging benefit eligibility determinations. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 (1989). Where a plaintiff challenges a denial of benefits under § 1132(a)(1)(B), a court must review the denial "under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Id.* at 115.

The Eleventh Circuit has developed a multi-step framework for analyzing an administrator's benefits determination:

> (1) Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (*i.e.*, the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.
> (2) If the administrator's decision in fact is "*de novo* wrong," then determine whether [the administrator] was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.
> (3) If the administrator's decision is "*de novo* wrong" and he was vested with discretion in reviewing claims, then determine whether

"reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).
(4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then [end the inquiry and affirm the decision].

*See Capone v. Aetna Life Ins. Co.*, 592 F.3d 1189, 1195-96 (11th Cir. 2010). If the claim administrator operated under a conflict of interest, the conflict of interest is "a factor for the district court to take into account when determining whether an administrator's decision was arbitrary and capricious." *Id.* at 1197 (citations omitted). The burden is on the plaintiff to show that the denial of benefits was arbitrary. *Id.*

3. **Analysis**

   A. **Standard of Review**
   The first issue that the Court must address is whether Liberty was vested with discretion in reviewing Diaz's claim for LTD benefits. If Liberty had discretionary authority, then the ultimate question would be whether reasonable grounds supported the decision to deny benefits; in other words, whether Liberty's decision was arbitrary and capricious. *Capone*, 592 F.3d 1195. The Eleventh Circuit has held that *de novo* review is necessary "unless the plan *expressly* provides the administrator discretionary authority to make eligibility determinations or to construe the plan's terms." *Kirwan v. Marriott Corp.*, 10 F.3d 784, 788 (11th Cir. 1994) (emphasis in original) (citations omitted).

   The Group Disability Income Policy states "Liberty shall possess the discretionary authority to construe the terms of this policy and to determine benefit eligibility hereunder." (Admin. R. at 44, ECF No. 24-1.) Nonetheless, Diaz argues that the Court should conduct a *de novo* review because JM Family Enterprises' Choice Plan, which Diaz alleges is essentially the "originating plan document," grants discretionary authority to JM Family Enterprises rather than Liberty. (Pl.'s Mot. for Summ. J. at 3-4.)

   The Choice Plan went into effect on January 1, 2008, and its purpose was to provide welfare benefits for JM Enterprises' employees. (Choice Plan at 2, ECF No. 22-4.) The Choice Plan defines "Claims Administrator" as "the person or entity providing, to the extent delegated and in connection with the operation of the [Choice Plan] and the payment of claims, administrative services to" JM Family Enterprises. (*Id.* at 5.) Section 5.1 of the Choice Plan provides that, "Except as provided in Section 5.8 with respect to insured

Benefit Options . . . the operation and administration of the Plan, the exclusive power and discretion to interpret the Plan, and the responsibility for carrying out the Plan's provisions are vested in the Committee and its delegates . . . ." (*Id.* at 12.) The Committee is JM Family Enterprises' Administrative Committee, which is comprised of individuals designated to perform various plan administration duties. (*Id.* at 5.)

With respect to benefit options that are fully insured, Section 5.8 provides that the insurance company will be the "named fiduciary" within the meaning of ERISA Section 402, and that:

> [T]he Claims Administrator of such Benefit Option will have the authority and responsibility for administering and controlling such Benefit Option with all the power and discretion accorded to the Company and the Committee under this Article to carry out its responsibilities. Notwithstanding anything in this Plan to the contrary, this designation will govern and be binding upon the Plan and the insurance company without regard to any conflicting or inconsistent language in any Summary Plan Description or Schedule of Benefits for that Benefit Option.

(*Id.* at 14.)

As support for his argument that the Choice Plan vests discretion with JM Family Enterprises, Diaz attempts to rely on the provisions preceding Section 5.8, which govern the Administrative Committee's powers and duties and places limits on the Administrative Committee's ability to delegate its duties. (*Id.* at 12-14.) However, Section 5.1 specifically excepts insured benefit options from the discretion conferred on the Administrative Committee. Moreover, Section 5.8 is clear that "notwithstanding anything in this Plan to the contrary," the Claims Administrator of an insured benefit option has all the discretion otherwise accorded to the Administrative Committee. (*Id.* at 14.) Therefore, even if the preceding sections could be interpreted to conflict with Section 5.8, the language in Section 5.8 is clear that the discretion accorded to the Claims Administrator of an insured benefit option supersedes anything to the contrary in any other provision of the Choice Plan.

Diaz also argues that the grant of discretion in Section 5.8 is not express because it does not name a specific entity to which the discretion is granted. (Pl.'s Mot. for Summ. J. at 6.) Diaz has provided no authority to support this proposition, and it simply does not make sense to interpret the Choice Plan in that manner since the plan governs multiple benefit options that are likely to change over time.

It is difficult to imagine a more clearly worded grant of discretion than that included in the Group Disability Income Policy, which states, "Liberty shall possess the discretionary authority to construe the terms of this policy and to determine benefit eligibility hereunder." (Admin. R. at 44, ECF No. 24-1.) The Choice Plan states that the terms of the benefit options and their related documents "are hereby incorporated by reference into this Plan to the extent they are consistent with this Plan." (Choice Plan at 7.) The grant of discretion in the Group Disability Income Policy is consistent with Sections 5.1 and 5.8 of the Choice Plan. Therefore, the Court will review Liberty's decision to deny Diaz's claim for LTD benefits under the abuse of discretion standard.

### B. Reasonableness of Liberty's Decision to Deny Benefits

Under the abuse of discretion standard, the Court must determine whether Liberty's decision was supported by reasonable grounds. *Capone*, 592 F.3d at 1195-96; *see also Glazer v. Reliance Standard Life Ins. Co.*, 524 F.3d 1241, 1246 (11th Cir. 2008) (internal quotations and citations omitted) ("the function of the court is to determine whether there was a reasonable basis for the decision, based upon the facts as known to the administrator at the time the decision was made."). "A reasonable determination is not necessarily the 'best' determination, or even the result the Court would have reached . . . . Thus, even if there is evidence that would support a contrary decision, the Court must accord deference to the administrator's decision if reasonable." *Bloom v. Hartford Life and Acc. Ins. Co.*, 917 F.Supp.2d 1269, 1285 (S.D. Fla. 2013) (Ryskamp, J.) (internal quotations and citations omitted).

As an initial matter, Diaz argues that because the Group Disability Income Policy requires a claimant to prove that he cannot perform the material and substantial duties of his occupation, "[t]he logical reciprocal is that Liberty's denial would need to cite to substantial evidence that he does not meet the definition, i.e. that Diaz **could** perform the material and substantial duties of his occupation." (Pl.'s Mot. for Summ. J. at 12.) (emphasis in original). Therefore, Diaz takes issue with the fact that Liberty did not "articulate which duties Diaz could perform or why." (*Id.*) However, the plain language of the benefits policy does not impose such a burden on Liberty, and the Eleventh Circuit has routinely held that the burden is on the claimant "to obtain evidence to prove her disability at the time of the administrator's review." *See, e.g., Glazer*, 524 F.3d at 1247 (citing *Horton v. Reliance Standard Life Ins. Co.*, 141 F.3d 1038, 1040 (11th Cir. 1998)); *see also Bloom*, 917 F.Supp.2d at 1279 (citations omitted).

Diaz also generally faults Liberty for being "laser focused on the time period from October 16, 2015 until October 4, 2016 . . . ." (Pl.'s Mem. in Opp.

at 3, ECF No. 34.) However, in order to receive benefits under the terms of the policy, Diaz was required to prove that he was disabled from October 16, 2015, his last day of active employment, through the 180-day Elimination Period, which expired on April 12, 2016. Thus, Liberty appropriately focused on whether there was sufficient evidence of a disability during the Elimination Period. Since Diaz's coverage under the benefits plan ceased when he terminated his active employment, any proof of disability after April 13, 2016 is irrelevant. (Admin. R. at 41, ECF No. 24-1.)

Liberty does not dispute that there was evidence that Diaz had a medical condition. (Def.'s Mot. for Summ. J. at 10.) However, Liberty argues that there was insufficient evidence that the medical condition actually impaired Diaz's functionality to the point that he was unable to perform the material and substantial duties of his occupation. (Def.'s Mot. for Summ. J. at 10.) Two different consulting physicians reviewed Diaz's medical records: Dr. Griggs reviewed the records during Liberty's initial review of Diaz's claim, and Dr. Foland reviewed the records on appeal. (Admin. R. at 102-114, ECF No. 24-3; Admin. R. at 73-87, ECF No. 24-1.) Both physicians concluded that there was insufficient evidence to support any restrictions or limitations during the Elimination Period and beyond. (*Id.* at 73, ECF No. 24-1; *id.* at 102, ECF No. 24-3.)

Dr. Griggs's report contains a detailed and thorough review of Diaz's medical records. (*Id.* at 102-114, ECF No. 24-3.) In addition to the conclusions summarized in the letter denying Diaz's claim for benefits, Dr. Griggs's full report noted that an October 12, 2015 report from Dr. Abrahams stated: "Inconsistent in all range of motion and manual muscle testing and minimal effort given, Self-limiting behavior and inconsistencies in therapy have limited thus far." (*Id.* at 107.) Dr. Griggs also noted that Dr. Molinares indicated during their conversation "that [Diaz's] functional capabilities are difficult to assess given his lack of motivation, esteem, and effort . . . ." (*Id.* at 108.) Dr. Griggs opined that, "[f]unctional assessment of physical capabilities has not been possible according to the record because of poor effort on the part of the claimant. Inconsistencies in range of motion, strength, physical endurance and activity tolerance made efforts at determining capacity impossible." (*Id.*) Dr. Griggs concluded that:

> Multiple providers document variable subjective complaints as well as difficulty in assessing physical function objectively. The medical record documents no reproducible, coherent abnormal physical examination clinical findings consistent with a physical medical

diagnosis and the continuing physical complaints do not appear to be the basis for his current restrictions and limitations.

(*Id.*)

Dr. Foland's report also contains a thorough review of Diaz's medical records, and Dr. Foland reached conclusions that were similar to those of Dr. Griggs. (*Id.* at 76-82, ECF No. 24-1.) In addition to the information summarized above, Dr. Foland noted that she reviewed medical records from Dr. Newman. (*Id.* at 79.) On November 9, 2015, Dr. Newman completed a workers' compensation status form that indicated that Diaz had achieved maximum medical improvement as of November 9, 2015, and had a "0% Permanent Impairment Rating." (*Id.* at 266-68, ECF No. 24-3.) This opinion is supported by Dr. Newman's notes from Diaz's November 9, 2015 office visit, which indicated that Diaz had normal strength in the muscles examined and concluded:

> There is really nothing else that I can offer him neurologically. His EMG/nerve conduction studies of the upper and lower extremities were normal . . . this patient has reached maximum medical improvement neurologically with no evidence of permanent neurological impairment from that accident and no restrictions neurologically regarding that accident.

(*Id.* at 270-71.)

In addition, two different consulting psychiatrists reviewed Diaz's medical records: Dr. Segal reviewed the records during the initial review of Diaz's claim, and Dr. Forehand reviewed the records on appeal. (*Id.* at 129-135, ECF No. 24-3; 73-84, ECF No. 24-1.) As noted in the letter denying Diaz's claim for benefits, Dr. Segal concluded that there was no evidence of a psychiatric diagnosis until March 1, 2016. (*Id.* at 129, ECF No. 24-3.) Dr. Forehand concluded that Diaz had documented deficits in concentration from March 1, 2016 through April 21, 2016, but concluded that there was no evidence that the deficits rose to the level of impairment. (*Id.* at 81, ECF No. 24-1.) Dr. Forehand also noted that on May 24, 2016, Dr. Molinares documented that Diaz's "psychiatric condition was well-controlled." (*Id.* at 81, ECF No. 24-1.)

Diaz makes several arguments in support of his assertion that Liberty's decision to deny his claim for benefits was incorrect. First, Diaz argues that Liberty's reviewing physicians ignored key findings in the record that supported the results of the FCE. (*Id.* at 16-19.) Second, Diaz notes that his "counseling records document restlessness, difficulty concentrating, irritability, e.g." (Pl.'s Mot. for Summ. J. at 13.) Third, Diaz argues that Liberty improperly relied on the opinions of its consulting psychiatrists because they did not examine or

interview Diaz. (*Id.* at 14.) Fourth, Diaz argues that Liberty failed to account for Diaz's pain and the side effects of his medications. (*Id.* at 15-16; Pl.'s Resp. in Opp. at 9.) The Court will address each argument in turn. Finally, the Court will address Liberty's conflict of interest.

### *1.  Inconsistency of the FCE Results With Other Medical Records*

As an initial matter, the Court notes that the FCE was performed on October 4, 2016, nearly one year after Diaz stopped working. (Admin. R. at 117, ECF No. 24-1.) Therefore, even if the Court were to agree with Diaz that Liberty should have given the FCE more weight, Diaz would still not be entitled to LTD benefits because the FCE does not establish that Diaz was unable to perform the material and substantial duties of his occupation during the Elimination Period. Moreover, Dr. Foland provided three primary reasons for discounting the FCE results.

First, Dr. Foland opined that the FCE results were not consistent with the medical records leading up to the date of the FCE. (*Id.* at 86, ECF No. 24-1.) Diaz argues that Dr. Foland overlooked Dr. Molinares's notes stating that Diaz required assistance getting on and off of the exam table and had no sensation bilaterally in his legs and feet. (Pl.'s Mot. for Summ. J. at 16-17.) The notes to which Diaz cites are dated June 26, 2016, and are therefore outside of the Elimination Period. (Admin. R. at 308, ECF No. 24-1.) Moreover, the only restrictions that Dr. Molinares recommended during that evaluation were to "avoid heavy weight lifting, use back brace if necessary, [a]pply heat and ice alternating every 1-2 hours for 20 minutes," and to take pain medication as needed. (*Id.* at 309.) These restrictions were the same restrictions that Dr. Molinares consistently recommended dating back to November 24, 2015. (*See id.* at 13-16, ECF No. 24-3.) Liberty's vocational expert opined that, at most, Diaz's occupation required "exerting up to 20 pounds of force occasionally, and/or up to 10 pounds of force frequently, and/or a negligible amount of force constantly." (*Id.* at 261.) None of the job requirements identified by the vocational expert conflict with the restrictions recommended by Dr. Molinares.

Diaz also argues that Dr. Foland overlooked Dr. Westerfield's notes from April 13, 2016, which Diaz alleges include a note "regarding 'lumbar radiculopathy to the toes including numbness and tingling.'" (Pl.'s Mot. for Summ. J. at 17.) The note to which Diaz refers states that Diaz "*still reports* persistent lumbar radiculopathy to the toes including numbness and tingling." (Admin. R. at 461, ECF No. 24-1) (emphasis added.) Thus, the quote on which Diaz relies was not a diagnosis; rather it was a notation concerning the symptoms that Diaz reported to Dr. Westerfield. The notes from Dr. Westerfield's examination of Diaz indicate that Diaz was in no acute distress,

that he had "sensation normal bilateral upper and lower extremities," and "normal gait without assistive devices." (*Id.*) Dr. Westerfield noted that he "[d]iscussed with patient conservative treatment options for unstable symptoms of lumbar radiculopathy. He has been lost to followup for approximately 10 months and has failed conservative treatment options." (*Id.* at 461-62.) Dr. Westerfield's notes do not impose any restrictions or limitations that would have interfered with Diaz's ability to perform the duties of his occupation, nor do they contradict the conclusions drawn by Dr. Foland.

Diaz argues that Dr. Foland ignored "Diaz's consistently abnormal orthopedic (musculoskeletal) examinations, which consistently revealed limited range of motion, spasms, muscle tenderness, edema, positive straight leg tests – all consistent with the findings of the FCE." (Pl.'s Mot. for Summ. J. at 17.) However, the only record that Diaz cites in support of this argument are Dr. Molinares's notes from June 26, 2016, which, as discussed above, are insufficient to demonstrate a disability during the Elimination Period and do not demonstrate that Diaz was unable to perform the duties of his occupation.

Dr. Foland's second reason for discounting the FCE results was that Anthony Pribila, who conducted the FCE, provided an opinion that Diaz demonstrated full and consistent effort on all tasks, despite the fact that on three of the grip and pinch strength tests Diaz was found to have a coefficient of variation in testing outside of the range considered to be valid, consistent, and reproducible. (Admin. R. at 79-80, 96, ECF No. 24-1.) Dr. Foland found that Pribila's conclusion was not supported by the results of the testing, and also found that the lack of a valid result on those three tests was consistent with the observations of Diaz's treatment providers that Diaz exhibited inconsistent effort and self-limiting behaviors. (*Id.* at 86.)

The final reason that Dr. Foland provided for discounting the FCE results was that the accuracy and reliability of FCEs has not been adequately researched. (*Id.*) However, as Diaz correctly notes, "[c]ourts have recognized that plan administrators routinely rely on FCEs, and that an FCE is the best means of assessing an individual's functional level." *Moeller v. Guardian Lief Ins. Co. of America*, No. 5:10-cv-457-Oc-34TBS, 2011 WL 7981954, at *7 (M.D. Fla. Dec. 16, 2011) (internal quotations and citations omitted). Nonetheless, the fact that this ground for discounting the FCE results was unsupported does not undermine the fact that Dr. Foland had a reasonable basis for concluding that the FCE results were inconsistent with Diaz's other medical records.

Liberty and its consulting physicians and psychiatrists acknowledged that the evidence in the record supported at least some of Diaz's diagnoses. However, a "'diagnosis does not by itself establish disability.'" *Giertz-Richardson*

*v. Hartford Life and Acc. Ins. Co.*, 536 F.Supp.2d 1280, 1293 (M.D. Fla. 2008) (quoting *Jordan v. Northrop Grumman Corp. Welfare Benefit Plan*, 370 F.3d 869, 880 (9th Cir. 2004)). Liberty had a reasonable basis for determining that Diaz failed to provide sufficient evidence that he was unable to perform the material and substantial duties of his occupation during the Elimination Period.

### 2. *Documentation of Restlessness, Difficulty Concentrating, and Irritability*

Diaz alleges that his "counseling records document restlessness, difficulty concentrating, irritability, e.g." (Pl.'s Mot. for Summ. J. at 13.) However, the only document to which Diaz cites in support of this allegation is a record from Orlando Behavioral Health dated April 7, 2016. (Admin. R. at 149, ECF No. 24-3.) Under the section titled "Depression Symptoms Reported," the box for "Poor concentration/indecisiveness" is checked. (*Id.* at 150.) The examination notes state that Diaz's attention span and concentration were "moderately impaired," with a functional assessment that Diaz "was impaired for work/school." (*Id.* at 151.) Additional Orlando Behavioral Health records dated March 1, 2016 and March 29, 2016 also noted that Diaz's attention span and concentration were moderately impaired, but did not contain any notations concerning work-related restrictions. (*Id.* at 152-160.) Construing these records in the light most favorable to the Plaintiff, they demonstrate that Diaz's concentration was moderately impaired from March 1, 2016 through April 7, 2016. However, this is insufficient to establish that Diaz was disabled throughout the entire Elimination Period. Furthermore, this is entirely consistent with the conclusions of Dr. Segal and Dr. Forehand, who opined that Diaz's deficits in concentration were supported from March 1, 2016 through April 21, 2016. (Admin. R. at 66, ECF No. 24-1.)

### 3. *Reliance on Opinions of Consulting Psychiatrists*

Diaz argues that Liberty improperly relied on the opinions of its consulting psychiatrists, Dr. Foland and Dr. Segal, because they did not examine or interview Diaz. (Pl.'s Mot. for Summ. J. at 14.) Diaz asserts that "courts routinely discount or entirely disregard the opinion of psychiatrists who have not examined the individual," and suggests that it is unethical for a psychiatrist to offer a professional opinion without conducting an examination. (*Id.* at 14-15.)

However, the Eleventh Circuit has held that the use of file reviews by independent doctors, as opposed to "live, physical examinations," is not evidence that a plan administrator acted arbitrarily and capriciously, "particularly in the absence of other troubling evidence." *Blankenship*, 644 F.3d

at 1357 (citing *Bennett v. Kemper Nat'l Servs., Inc.*, 514 F.3d 547, 554 (6th Cir. 2008)). The Eleventh Circuit has also stated that if a claims administrator submits a file for a peer review, it is entitled to discount a treating physician's opinion in favor of a contrary opinion produced by a peer review. *Helms v. General Dynamics Corp.*, 222 Fed. Appx. 821, 833 (11th Cir. 2007) (citing *House v. Paul Revere Life Ins. Co.*, 241 F.3d 1045, 1048 (8th Cir. 2001)). Diaz has cited to no case law from the Eleventh Circuit that creates a different rule for peer reviews by psychiatrists. Furthermore, as Liberty notes, courts within the Eleventh Circuit have upheld benefits denial decisions even where the plan administrator utilized the opinions of consulting psychiatrists and/or psychologists. *See, e.g., Meadows v. American Airlines, Inc.*, No. 10-22175, 2011 WL 1102774, at *13-14 (S.D. Fla. Mar. 24, 2011) (Altonaga, J.); *Prater v. Health and Welfare Plan for Emp.'s of Florida Power and Light Grp., Inc.*, No. 6:10-cv-194-ORL-36DAB, 2012 WL 1059785, at *7-8 (M.D. Fla. Mar. 28, 2012); *Ingram v. Aetna Life Ins. Co.*, No. 3:08cv113, 2010 WL 3788873 (N.D. Fla. Sept. 24, 2010).

Here, neither of the consulting psychiatrists reached a different conclusion than Diaz's treating psychiatrists. Rather, both consulting psychiatrists noted the lack of documentation in Diaz's records of any psychiatric diagnosis until March 2016, and both psychiatrists found that there was documentation that Diaz had difficulty concentrating in March and April of 2016. Diaz has cited to nothing in the record that establishes any limitations as a result of a psychiatric disorder prior to March 2016. Therefore, Liberty's reliance on the opinions of Dr. Forehand and Dr. Segal was not arbitrary and capricious because their conclusions were supported by the records from Diaz's treating psychiatrists.

### *4.     Documentation of Pain and Side Effects of Medication*

Finally, Diaz argues that Liberty failed to account for Diaz's pain and the side effects of his medications. (Pl.'s Mot. for Summ. J. at 15-16; Pl.'s Mem. in Opp. at 9.) Diaz asserts that "[p]ain itself may constitute a disabling impairment." (*Id.* at 16.) However, as Diaz acknowledges, the benefits policy required Diaz to prove that he could not perform the material and substantial duties of his occupation. As the Court has already explained, Liberty had a reasonable basis for concluding that the documentation provided by Diaz failed to establish that he had physical limitations throughout the Elimination Period and beyond. The Court has found nothing in the record that consistently establishes that Diaz's pain or the side effects of his medication prevented him from performing the material and substantial duties of his occupation throughout the Elimination Period.

### 5. *Conflict of Interest*

Since Liberty determines whether an employee is eligible for benefits and also pays the benefits, it operates under a conflict of interest. (*See* Def.'s Statement of Facts ¶ 2, ECF No. 28); *Blankenship*, 644 F.3d at 1355 (citations omitted) (a "pertinent conflict of interest exists where the ERISA plan administrator both makes eligibility decisions and pays awarded benefits out of its own funds"). The conflict of interest is a factor that the Court must consider in reviewing Liberty's benefits-denial decision. *Capone*, 592 F.3d at 1196. Despite the conflict of interest, it is the plaintiff's burden to show that Liberty's decision was arbitrary and capricious; "it is not the defendant's burden to prove its decision was not tainted by self-interest." *Id.* (quoting *Doyle v. Liberty Life Assurance Co. of Boston*, 542 F.3d 1352, 1360 (11th Cir. 2008)). The effect that a conflict of interest will have in any given case varies "according to the severity of the conflict and the nature of the case: we look to the conflict's 'inherent or case-specific importance.'" *Blankenship*, 644 F.3d at 1355 (quoting *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 116-119 (2008)) (further noting that while courts must account for a conflict of interest, the "basic analysis still centers on assessing whether a reasonable basis existed for the administrator's benefits decision"). Diaz has made no substantive allegations concerning the effect of Liberty's conflict of interest, and the Court has found nothing in the record that suggests that Liberty's decision was arbitrary and capricious due to the conflict of interest.

### 4. Conclusion

Having considered the arguments of the parties, the record, and the relevant legal authorities, the Court finds that Liberty's decision to deny Diaz's claim for LTD benefits was supported by reasonable grounds and was not arbitrary and capricious. Accordingly, the Court **denies** the Plaintiff's Motion for Summary Judgment (**ECF No. 25**) and **grants** the Defendant's Motion for Summary Judgment (**ECF No. 27**).

**Done and ordered** in chambers, at Miami, Florida, on August 30, 2017

_____
Robert N. Scola, Jr.
United States District Judge